Erin E. Hogan-Freemole, OSB # 212850
(541) 301-4618 │ erin@crag.org
Oliver J. H. Stiefel, OSB # 135436
(503) 227-2212 │ oliver@crag.org
CRAG LAW CENTER
3141 E. Burnside St.
Portland, Oregon 97214
Fax: (503) 296-5454

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| **UMPQUA WATERSHEDS**, an Oregon non-profit corporation; **CASCADIA WILDLANDS**, an Oregon non-profit corporation; and **OREGON WILD**, an Oregon non-profit corporation, | Case No. 21-1505 |
| Plaintiffs, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | (5 U.S.C. § 706(2)) |
| **SHERRI CHAMBERS**, in her official capacity as North Umpqua District Ranger; and the **UNITED STATES FOREST SERVICE**, | (Environmental Matters – National Forest Management Act, National Environmental Policy Act, and Administrative Procedure Act) |
| Defendants. | |

## NATURE OF ACTION

1.      Plaintiffs Umpqua Watersheds, Cascadia Wildlands, and Oregon Wild (collectively "Umpqua Watersheds") bring this challenge under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, to the final administrative actions of Sherri Chambers and the United States Forest Service (collectively "Forest Service" or "Defendants"). In approving the Decision Memorandum ("DM") for the Archie Creek Fire Roadside Danger Tree Project ("Archie Creek Project" or "Project") on the Umpqua National Forest ("Forest"), Defendants acted arbitrarily, capriciously, and contrary to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370h; and the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600–1614.

2.      The DM authorizes the cutting of dead, fire-impacted, and some green trees on 2,642 acres of Forest lands within or immediately adjacent to the 2020 Archie Creek Fire perimeter. Trees would be cut and left, or cut and removed as commercial timber, up to 300 feet on either side of 65 miles of forest roads.

3.      The identified roads are not suitable or maintained for passenger car travel. Most receive very little traffic, and most of the trees targeted for cutting pose no immediate danger.

4.      The Project area includes old growth forest, riparian zones, a designated Wild and Scenic River, two inventoried roadless areas, and critical habitat for the northern spotted owl. The Project would negatively impact these sensitive areas, degrading riparian habitat, increasing creek sedimentation, fragmenting owl habitat, and disrupting the roadless character of the area.

5.      Under NEPA, the Forest Service is required to analyze and disclose the potential environmental impacts of its actions. But the Forest Service did not prepare an Environmental Impact Statement ("EIS"), or even an abbreviated Environmental Assessment ("EA") before

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—2

approving the Project. Instead, it approved the Project pursuant to a Categorical Exclusion ("CE"), thus avoiding a thorough review under NEPA. The Forest Service did not provide the public an opportunity to review and comment on the Project at all.

6.    The Forest Service approved the Project under a CE applicable to "repair and maintenance" of roads: 36 C.F.R. § 220.6(d)(4). CEs apply only to categories of actions the Forest Service has determined have no significant environmental effects, either individually or cumulatively. The Forest Service failed to articulate a rational explanation as to how a logging project of this scale constitutes routine road "repair and maintenance"; the agency never has determined that a project of this nature and scale has no significant environmental effects.

7.    Before approving a project of this magnitude, targeting tens of thousands of trees, many of which are still alive and pose no imminent safety risk, the Forest Service must prepare an EIS or EA. It must take the requisite "hard look" at the Project's environmental impacts, trade-offs, and alternatives, disclose those impacts to the public, and consider public comment.

8.    Umpqua Watersheds further challenges the Forest Service's authorization of salvage logging within the Late-Successional Reserves ("LSR") and Riparian Reserves as inconsistent with the Northwest Forest Plan ("NWFP") and in violation of NFMA because the Forest Service has not explained how it can comply with NWFP standards and guidelines.

9.    Umpqua Watersheds respectfully requests that this Court vacate the DM and remand to the Forest Service for a full and fair analysis of the Project's impacts in an EIS or EA.

10.    If necessary, Umpqua Watersheds intends to seek narrowly tailored injunctive relief during the pendency of this litigation to protect sensitive species and their habitats.

11.    Should it prevail, Umpqua Watersheds will seek attorneys' fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412, and/or any other applicable authorities.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Umpqua Watersheds' claims present federal questions. A present, actual, and justiciable controversy exists between the parties. The requested relief for a declaratory judgment is proper under 28 U.S.C. § 2201, and the requested injunctive relief is proper under 28 U.S.C. § 2202.

13.     The Forest Service did not conduct a public scoping process or offer an opportunity for the public to comment on its proposal. Umpqua Watersheds was thus denied the ability to participate in the decisionmaking process and had no administrative remedy available to exhaust.

14.     The challenged agency action is subject to this Court's review under 5 U.S.C. §§ 702, 704, and 706. Defendants have waived sovereign immunity pursuant to 5 U.S.C. § 702.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 as the Project area is located within this judicial district. Defendants maintain an office in this judicial district. Plaintiffs Cascadia Wildlands, Oregon Wild, and Umpqua Watersheds maintain offices in this judicial district.

16.     This case is properly filed in the Eugene Division pursuant to Local Rule 3-2 because a substantial part of the Project area, and Defendants' office where the DM was signed, are located in Douglas County. A substantial part of the events or omissions giving rise to this claim occurred and the property that is subject to this action is situated in the Eugene Division.

## PARTIES

### Plaintiffs

1.     Plaintiff UMPQUA WATERSHEDS is a nonprofit corporation headquartered in Roseburg, Oregon, with members throughout Oregon. Since 1986 the organization has been

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—4

dedicated to protecting and restoring the Umpqua watershed and forest lands through education, training, advocacy, and ecologically responsible stewardship. Umpqua Watersheds and its members, staff, and supporters frequently experience and appreciate the aesthetics of the Forest and its wildlife. They recognize that fire is a natural, integral part of forest ecosystems, and continue to enjoy the area affected by the Archie Creek Fire.

2.      Umpqua Watersheds is headquartered near the Project area, which its members have used and will continue to use for activities such as hiking, rafting, camping, wildlife observation and research, and nature photography. Its members frequently organize and participate in volunteer events on the Forest, including community hikes, River Appreciation Day, and a riparian-restoration project in the Archie Creek area. Many staff, members, and volunteers have immediate plans to continue these activities in and around the Project area. These activities are crucial to the mission and identity of Umpqua Watersheds, and its staff, members, and supporters in the community have aesthetic, recreational, spiritual, educational, and scientific interests would be harmed by the Project's implementation.

3.      Plaintiff CASCADIA WILDLANDS is a non-profit corporation headquartered in Eugene, Oregon, with approximately 12,000 members and supporters throughout the United States. Cascadia Wildlands educates, organizes, and advocates to protect and restore wild ecosystems in the Cascadia Bioregion, extending from Northern California up into Alaska. Cascadia Wildlands recognizes wildland fire as an integral part of forest ecosystems and seeks to educate the public about the important role fire plays in the forest and the unique value of post-fire landscapes. Cascadia Wildlands' members have used and will continue to use the Project area for activities such as hiking, bird watching, camping, swimming, fishing, foraging, photography, and other recreational and professional pursuits.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—5

4.      Plaintiff OREGON WILD is a non-profit corporation with approximately 20,000 members and supporters throughout the state of Oregon and the Pacific Northwest. Oregon Wild is headquartered in Portland, Oregon, with field offices in Bend, Eugene, and Enterprise, Oregon. Oregon Wild's mission is to protect and restore Oregon's wildlands, wildlife, and waters as an enduring legacy. Oregon Wild's wilderness, old-growth forest, and clean rivers/watersheds programs protect clean drinking water, outdoor recreation opportunities, and wildlife habitat across Oregon. Oregon Wild and its members organize educational hikes in forests around the state. They have used and will continue to use the Project area for activities including hiking, camping, rafting, bird watching, and other recreational, professional, and educational pursuits.

5.      Umpqua Watersheds has organizational interests in the proper and lawful management of the Forest. Umpqua Watersheds and its members, supporters, and staff have participated extensively in similar and related administrative actions. Plaintiff Umpqua Watersheds submitted comments on a recent proposal to log the Archie Creek Fire area managed by the Bureau of Land Management; had the Forest Service afforded a similar opportunity on its similar proposal, Umpqua Watersheds would have submitted comments on the Project. The Forest Service's refusal to comply with NEPA denied Umpqua Watersheds and its members, supporters, and staff the ability to participate in the administrative process.

6.      Umpqua Watersheds and its members, supporters, and staff would sustain injury to aesthetic, educational, professional, recreational, spiritual, and scientific interests if the Project proceeds as authorized. Umpqua Watersheds and its members, supporters, and staff have concrete plans to return to the area where the Project is proposed. Unless this Court grants the requested relief, Umpqua Watersheds and its members, supporters, and staff will be adversely and irreparably harmed by the Project.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

**Defendants**

7.      Defendant SHERRI CHAMBERS is the District Ranger for the North Umpqua

Ranger District, where a significant portion of the proposed Project activities would occur. Ms.

Chambers is the Responsible Official for the Project, and she signed the Decision Memorandum,

constituting the final administrative action. As District Ranger, Ms. Chambers is responsible for

ensuring that all projects in the District are consistent with applicable laws and regulations.

Plaintiff brings this action against Ms. Chambers in her official capacity.

8.      Defendant the UNITED STATES FOREST SERVICE is an agency within the

United States Department of Agriculture entrusted with the management of our national forests.

The Forest Service is headquartered in Washington, D.C., and it has nine regions across the

country. The Umpqua National Forest is in Region 6. All or a significant portion of the actions

and omissions alleged in this Complaint occurred in Region 6.

## LEGAL BACKGROUND

**Administrative Procedure Act (APA)**

9.      The APA confers a right of judicial review on any person adversely affected by

agency action within the meaning of a relevant statute. 5 U.S.C. § 702. Agency actions made

reviewable by statute and final agency actions for which no other adequate remedy exists are

subject to judicial review under the APA. 5 U.S.C. § 704.

10.      Upon review under the APA, a court shall "hold unlawful and set aside agency

action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law." 5 U.S.C. § 706(2). When an agency has taken action without observance

of the procedure required by law, that action will be set aside. 5 U.S.C. § 706(2)(D).

///

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—7

**National Environmental Policy Act (NEPA)**

11.     Congress enacted NEPA to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321.

12.     To achieve these aims, NEPA and its implementing regulations set forth procedures designed to (1) ensure that federal agencies take a "hard look" at the environmental consequences of their proposed actions, and (2) foster meaningful public participation.

13.     NEPA requires all federal agencies to prepare a "detailed statement" for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This detailed statement, known as an EIS, must describe the environmental impacts of the proposed action and alternatives to the proposed action. *Id*. NEPA further requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E).

14.     Where the proposed action is "not likely to have significant effects or the significance of the effects is unknown," an agency may instead prepare an EA. 40 C.F.R. § 1501.3(a)(2). An EA must describe the proposed action's environmental impact and alternatives to the proposed action, and "provide sufficient evidence and analysis" to determine whether the environmental effects would be significant. 40 C.F.R. § 1501.5(a), (c). Like an EIS, the EA must be made publicly available, and the public must have the opportunity to be involved in the planning process. 40 C.F.R. § 1501.5(e).

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

15.     NEPA's implementing regulations also direct agencies to identify certain categories of actions that normally do not require preparation of an EA or EIS and may be authorized under a categorical exclusion. *See* 40 C.F.R. § 1501.4(a) (2021); 40 C.F.R. § 1508.4 (2019).  The regulations in effect prior to July 2020 defined a categorical exclusion as a "category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect by a federal agency in implementation of these regulations." 40 C.F.R. § 1508.4 (2019).

16.     If an agency determines that a proposed action falls under a CE it must evaluate the action for "extraordinary circumstances" which might make use of a CE inappropriate. 40 C.F.R. § 1501.4(b) (2021); 40 C.F.R. § 1508.4 (2019).

17.     In 2008 the Forest Service promulgated a series of CEs pursuant to the NEPA regulations then in effect. 40 C.F.R. § 1508.4 (2019); 57 Fed. Reg. 43,180 (Sept. 18, 1992) (establishing categories); 73 Fed. Reg. 43,084 (July 24, 2008) (placing established categories under Forest Service NEPA regulations at 36 C.F.R. Part 220).

18.     Forest Service regulations require "scoping" for all proposed actions, including those that would fall under a CE. 36 C.F.R. § 220.4(e)(1). If the responsible officer determines through the scoping process that the proposed action might cause a significant environmental effect, an EA or EIS must be prepared. *Id.*

19.     Under the Forest Service regulations, an action may be categorically excluded from further analysis and documentation in an EIS or EA "only if there are no extraordinary circumstances related to the proposed action" and if it is within one of the categories established by the Secretary or it is within a category listed in Section 220.6(d) and (e). 36 C.F.R. § 220.6(a).

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

20.     The Forest Service must consider certain "resource conditions" to determine whether extraordinary circumstances related to a proposed action warrant further analysis and documentation in an EA or EIS. Extraordinary circumstances may exist due to the presence of federally listed threatened or endangered species or their designated critical habitat, Forest Service sensitive species, or inventoried roadless areas. 36 C.F.R. § 220.6(b)(1). "The mere presence" of these resource conditions does not preclude use of a CE: "[i]t is the existence of a cause-effect relationship between a proposed action and the potential effect on these resource conditions, and . . . the degree of potential effect of a proposed action on these resource conditions that determines whether extraordinary circumstances exist." 36 C.F.R. § 220.6(b)(2).

21.     36 C.F.R. § 220.6(e) lists the categories of actions for which the agency must prepare a project or case file and decision memo. One such CE is for the "[s]alvage of dead and/or dying trees not to exceed 250 acres [and] requiring no more than 1/2 mile of temporary road construction," including the "[h]arvest of fire-damaged trees." 36 C.F.R. § 220.6(e)(13).

22.     36 C.F.R. § 220.6(d) lists the categories of actions for which a project or case file and decision memo are not required, including the "[r]epair and maintenance of roads, trails, and landline boundaries." 36 C.F.R. § 220.6(d)(4). Examples of road maintenance and repair include:

> Authorizing a user to grade, resurface, and clean the culverts of an established National Forest System road;
>
> Grading a road and clearing the roadside of brush without the use of herbicides;
>
> Resurfacing a road to its original condition;
>
> Pruning vegetation and cleaning culverts along a trail and grooming the surface of the trail; and
>
> Surveying, painting, and posting landline boundaries.

36 C.F.R. § 220.6(d)(4).

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—10

23.     The Forest Service authorized post-fire logging of 2,642 acres in the Archie Creek Project pursuant to the road maintenance CE, 36 C.F.R. § 220.6(d)(4).

**National Forest Management Act (NFMA)**

24.     The Forest is part of the National Forest System and is therefore subject to NFMA and its implementing regulations.

25.     Pursuant to NFMA, management of National Forests occurs at two levels: forest and project. At the forest level, NFMA requires the Secretary of Agriculture to "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System." 16 U.S.C. § 1604(a).

26.     The Forest Service, which manages the National Forest System, uses these "forest plans" to guide all natural resource management activities, including use of the land for outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness. 16 U.S.C. § 1604(e)(1).

27.     A forest plan is a broad, long-term, programmatic planning document for the entire forest, containing goals and objectives for individual units of the forest and providing standards and guidelines for management of forest resources. 36 C.F.R. § 219.4 (2000); 36 C.F.R. § 219.2(b)(2) (2021).

28.     At the project level, once a forest plan is in place, site-specific actions or "projects" are planned and evaluated by the Forest Service. Pursuant to NFMA, each site-specific project must be consistent with the governing forest plan. 16 U.S.C. § 1604(i). Each project must also be individually analyzed under NEPA, as the impacts will vary depending on site-specific conditions and project-specific activities.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

29.     In 1990, the Forest Service adopted the Umpqua National Forest Land and Resource Management Plan ("Forest Plan"), which provides standards and guidelines for project-level planning within the Forest.

30.     In 1994, the Forest Service adopted the Record of Decision for the Northwest Forest Plan. The NWFP established management requirements and mandatory standards for all Forest Service land within the range of the northern spotted owl.

31.     Central to these management requirements is the designation of Late-Successional Reserves, which provide crucial habitat for the northern spotted owl and other old-growth-dependent species. LSR areas are designed to maintain a functional, interacting, old-growth forest, and special management requirements and standards apply within them.

32.     The NWFP defines salvage logging as "the removal of trees from an area following a stand-replacing event such as those caused by wind, fires, insect infestations, volcanic eruptions, or diseases."

33.     Salvage logging within the LSR is subject to review by the Regional Ecosystem Office. Planning for salvage in the LSR should always focus on long-range objectives, and salvage operations should be designed to "accelerate or not impede" the development of late-successional forest conditions. Salvage operations should not diminish habitat suitability now or in the future.

34.     Salvage logging within the LSR is permissible only where disturbance has reduced the canopy closure to less than 40 percent. All standing live trees, including those injured by fire, should be retained. Coarse woody debris standards must be met; no trees should be removed if there are not enough downed logs per acre to meet those standards.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—12

35.    Because snags provide key habitat benefits for many wildlife species, the NWFP directs post-fire management to focus on retaining snags that are likely to persist until late-successional conditions have redeveloped—a period of at least 80 years.

36.    The NWFP recognizes that some danger trees near roads or campgrounds in the LSR must be felled for safety reasons. In such cases, salvage sales may be appropriate where the logs must be removed from the site. In other areas, "such as along roads," the guidelines encourage leaving fallen trees in place and bar log removal where coarse woody debris levels are inadequate.

37.    "Nonsilvicultural activities" that are neutral or beneficial to the creation or maintenance of late-successional habitat are generally allowed in the LSR. Road maintenance is permitted and may include felling hazard trees, although topping trees should be considered as an alternative to felling. Coarse woody debris standards must still be met and leaving the fallen trees on site is encouraged. Removal of these trees constitutes salvage logging and must comply with LSR salvage standards.

38.    The NWFP standards include the Aquatic Conservation Strategy ("ACS"), designed to maintain and restore the health of watersheds and the aquatic ecosystems contained within them. The ACS protects salmon and steelhead habitat on federal lands. It is also intended to benefit a wide variety of terrestrial wildlife species which depend on riparian habitats.

39.    A key part of the ACS is the protection of Riparian Reserves: portions of watersheds where riparian-dependent resources receive primary emphasis and where special standards and guidelines apply. Standards and guidelines prohibit and regulate activities in the Riparian Reserves that retard or prevent the attainment of ACS objectives.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

40.     Riparian Reserves consist of streams and other waterbodies and the area directly adjacent to them. The ACS sets specific widths of Riparian Reserves based on stream or waterbody type. For example, the Riparian Reserve of fish-bearing streams consists of the stream and the area on each side of the stream extending at least 300 feet slope distance (600 feet total). For permanently flowing non-fish-bearing streams, the Riparian Reserve consists of the stream and the area on each side of the stream extending at least 150 feet slope distance (300 feet total).

41.     Logging is prohibited in Riparian Reserves, with a few specific exceptions. Where a "catastrophic event" such as a fire has degraded riparian conditions, salvage logging is permitted if required to attain ACS objectives. Trees may be removed only when watershed analysis determines that present and future coarse woody debris needs are met and other ACS objective will not be adversely affected. Trees may be felled in the Riparian Reserves when they pose a safety risk but should still be left on site as needed to meet ACS objectives.

42.     The Forest is within the range of the northern spotted owl; the NWFP thus amended the Forest Plan to incorporate these standards and guidelines for managing LSR and Riparian Reserve areas. All management activities, actions, and projects on the Forest must comply with the Forest Plan and NWFP. If there are differences in management direction between the two documents, the more restrictive of the two governs.

## FACTUAL BACKGROUND

43.     The Umpqua National Forest lies on the western slopes of the Oregon Cascade Mountains, encompassing 983,239 acres of forest across Douglas, Lane, and Jackson Counties. The Forest stretches from the Willamette National Forest on the north to Crater Lake National Park to the southeast and the Rogue River Siskiyou National Forest to the southwest.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

44.    The Forest contains waterfalls, high mountain lakes, the Wild and Scenic North Umpqua River, whitewater rapids, alpine ecosystems, and old-growth forests. Its diverse and scenic landscape offers outstanding recreational opportunities and provides important wildlife habitat. The Forest is home to numerous at-risk fish and wildlife species, including several salmonids, sensitive bird and bat species, and the Endangered Species Act-listed northern spotted owl and Oregon Coast coho salmon.

45.    The Archie Creek Fire started on September 8, 2020 and burned 26,161 acres of Forest land in addition to a larger area managed by the Bureau of Land Management. The fire was declared contained on November 16, 2020.

46.    Numerous trees were cut during fire suppression activities and immediately post-fire.

47.    Shortly after the fire was declared contained, the Forest Service contracted with a timber company to cut and, in some cases remove as commercial timber dead and fire-impacted trees along 53 miles of Forest roads. An estimated 5,848,800 board feet of marketable timber was extracted. This "danger tree" removal project was completed in December 2020.

48.    The Forest Service undertook all of these logging operations during the emergency response without conducting any NEPA review.

49.    Separate from the emergency response, the Forest Service planned and authorized a salvage logging project targeting trees that were not felled during the emergency response.

50.    On August 18, 2021 Defendant Sherri Chambers signed the Archie Creek Fire Project Decision Memo, authorizing further post-fire logging on 65 miles of forest roads within and adjacent to the fire perimeter. The DM authorizes cutting trees on approximately 2,642 acres

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

within the 26,487-acre Project Area. The Forest Service chose to authorize the Project pursuant to the road "repair and maintenance" CE rather than preparing an EA or EIS.

51.    The Project authorizes the cutting of trees within one tree-height length of the road if they meet the Forest Service's tree selection criteria. Trees would be either cut and left in place or cut and removed as part of a commercial logging operation. The Forest Service has not disclosed how much of the Project would be commercially logged.

52.    The average tree height in the Project area is 170 feet, but trees may be cut further than 170 feet from the road if they are taller. Some trees up to 300 feet from the road could be cut, creating a logged strip up to 600 feet wide.

53.    According to the tree selection criteria, trees to be cut include: (1) trees with no green needles, (2) dead hardwoods, (3) trees with insect boring dust on at least 50 percent bole circumference, (4) trees otherwise identified by a Forest Service specialist, (5) green trees located between the target tree and the road as needed for safety, and (6) living trees with an estimated 50–60 percent chance of dying within three years based on canopy scorch or bark char.

54.    To identify trees with a 50–60 percent probability of mortality within three years, the selection criteria provide marking guidelines and a tree assessment rubric based on tree species, size, and extent of canopy scorch or bark char. The rubric is based on guidance from Sharon Hood et al., "Post-fire Assessment of Tree Status and Marking Guidelines for Conifers in Oregon and Washington," R6-FHP-RO-2020-02 (2020).

55.    The selection criteria call for cutting trees with a 50–60 percent probability of mortality, meaning that 40–50 percent of the trees to be cut would be expected to survive the fire. Hood et al. identifies this range as a "lower probability threshold," which is appropriate "when it is important to prevent leaving trees that may die." "Higher probability thresholds" of

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—16

80–90 percent should be used "when it is important to prevent taking trees that may live." The Forest Service did not explain why its selection criteria favor cutting trees that may live over leaving trees that may die.

56.     The Forest Service's selection criteria also favor removing larger, older trees, which are typically more fire-resilient. For example, a Douglas fir with a diameter at breast height of up to 41 inches will be cut if it has a 60 percent probability of mortality. A Douglas fir with a diameter of 42 inches or greater will be cut if it is deemed to have only a 50 percent chance of mortality. This preference for removing larger trees is not explained in the DM, the selection criteria, or the guidance documents cited by the Forest Service.

57.     Although the Forest Service asserts that the Project targets "danger trees" which could fall or slide into a road, its selection criteria do not address the trees' failure potential—their risk of falling within five years. Guidance from Gregory Filip et al., "Field Guide for Danger-Tree Identification and Response along Forest Roads and Work Sites in Oregon and Washington," R6-NR-TP-021-2016 (2016) advises that larger trees generally have lower failure potential than smaller-diameter trees. The Forest Service's selection criteria do not reflect this. The selection criteria do not include any of the "failure indicators" Filip et al. identifies to gauge a tree's failure potential. And the Project as a whole does not reflect Filip et al.'s guidance on prioritization for "danger tree" mitigation.

58.     The roads along which logging would occur are all designated as inappropriate for passenger car use. Most of the targeted roads are not part of the Forest's "key road system." They therefore receive very limited routine maintenance and may be inaccessible for extended periods of time.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

59.    National Forest System roads receive administrative designations regarding their "operational maintenance level" ("ML"), which refers to the level of service the road provides and the degree of maintenance thus required. ML 1 roads are closed to the general public. ML 2 roads are open to high-clearance vehicles for dispersed recreation and specialized commercial haul. ML 3, 4, and 5 roads are open for general use by passenger cars.

60.    Agency guidance stipulates that ML 1 and 2 roads are the lowest priority for danger tree treatments, due to low traffic volumes and only intermittent exposure of traffic to a potentially hazardous tree. Further, these roads are not intended for use by passenger cars and are not maintained to the higher standards of ML 3, 4, and 5 roads.

61.    All roads targeted by the Project are designated ML 2. They receive little traffic and are not maintained or suitable for use by passenger cars. Only a few sections of targeted roads are part of the Forest's "key road system."

62.    The Project also authorizes road construction and reconstruction, creation of skid and tractor roads and other log-skidding facilities, use of timber landings, construction of fire control lines, and wet-weather timber hauling. As logging activities of the sort authorized create highly flammable logging slash, the Project will incorporate fuels treatments including scattering, machine piling, pile burning, and prescribed burning.

63.    Tree cutting and removal will occur in areas designated LSR areas which provide important habitat for the threatened northern spotted owl. Commercial logging will also take place in fragile Riparian Reserve areas, inventoried roadless areas, and along a designated Wild and Scenic River.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—18

64.    Post-fire habitats are inherently fragile. Post-fire logging activities, other than hand-felling select trees and leaving them on site, generally are inconsistent with efforts to restore ecosystem functions after fire.

65.    Large trees that are dead and dying, including those along the remote forest roads targeted in the Project, provide valuable habitat for a wide variety of wildlife that rely on dead wood in the forest. Post-fire logging activities, including commercial salvage logging of the type proposed here, can cause habitat loss and fragmentation for wildlife species, including the northern spotted owl.

66.    The northern spotted owl was listed as "threatened" under the ESA in 1990 due to widespread habitat loss and inadequate existing regulatory mechanisms. Today, many populations of northern spotted owl continue to decline at alarming rates. As a result of the northern spotted owl's continued decline, in 2020 the U.S. Fish and Wildlife Service determined that the perilous status of the northern spotted owl warrants "uplisting" the species from threatened to "endangered." Managing sufficient habitat for the species now and into the future is therefore vital for its recovery.

67.    Northern spotted owl may forage in post-fire forest habitat, which offers a diversity of food sources to wildlife and is used by numerous small mammals and birds. Predators, including the northern spotted owl, seek out these burned areas due to their abundance of small animal prey species. Studies in post-fire landscapes have shown that northern spotted owls use forest stands that have been burned, including high-severity burned forest, but generally do not use stands that have been burned and logged.

68.    Roughly 40 percent of the Project will occur in the Late-Successional Reserves the northern spotted owl, among many other species, depends on to survive. LSR areas are

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—19

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

characterized by live old-growth trees, standing dead trees (snags), fallen trees or logs on the forest floor, and logs in streams. To protect and enhance these attributes, the NWFP strictly limits tree cutting and removal, including "salvage" logging, within the LSR.

69.     Salvage logging—defined in the NWFP as the removal of trees after a stand-replacing disturbance such as a fire—is permissible in the LSR only when it will not diminish habitat suitability now or in the future.

70.     The LSR salvage-logging guidelines state that "salvage should occur only in stands where disturbance has reduced canopy closure to less than 40 percent." Because "snags provide a variety of habitat benefits," post-fire activities should focus on retaining snags and large, fire-impacted trees likely to die. All standing live trees should be retained, including those "injured but likely to survive."

71.     The NWFP also requires the retention of minimum levels of coarse woody debris (fallen trees) after a disturbance. It acknowledges that the removal of danger trees may be necessary in some areas, but advises that in areas "such as along roads" leaving the felled trees in place is preferable. The trees cannot be removed as salvage if the coarse woody debris levels are inadequate.

72.     The Project authorizes not only cutting trees in the LSR, but removing the logs for timber as well. Outside of northern spotted owl cores and nest patches, the Project allows commercial logging throughout the LSR.

73.     The Forest Service acknowledges that the Project is "likely to adversely affect" northern spotted owls and their habitat in the LSR. Trees will be cut within 14 historic spotted owl sites. Commercial harvest will occur within designated critical habitat for the northern spotted owl and will remove nesting, roosting, foraging and capable habitat.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—20

74.     The Forest Service asserts that the Project need not conform to the NWFP standards for salvage logging in LSR because it is not for the purpose of salvage logging. Instead, the agency claims, it is for the purpose of abating danger trees for arterial roads that serve as key travel corridors for residents living in the area.

75.     The majority of the targeted roads are not part of the Forest's key road system. The majority of the targeted roads do not lead to private inholdings. And the majority of the targeted roads are not "arterial," as they do not provide service to large land areas or connect with public highways.

76.     The Forest Service does not explain why salvage logging for the purpose of road maintenance would be exempt from the NWFP standards for salvage. Nor does it explain why removal of the cut trees for commercial salvage is necessary for hazard mitigation.

77.     The Forest Service also asserts that coarse woody debris standards will be met because the Archie Creek Fire created many new snags within the Project area. But the Forest Service does not explain why the presence of snags throughout the 26,487-acre Project area changes the standards on the 2,642 acres on which Project activities will occur.

78.     The Forest Service does not assert that the Project will meet the NWFP's standards for LSR salvage logging. It concedes that the Project will likely adversely affect wildlife and critical habitat in the LSR.

79.     Post-fire logging activities, including commercial salvage logging, can also lead to the loss and fragmentation of aquatic habitats. The Project area supports numerous sensitive and threatened aquatic species, including the federally protected Oregon Coast coho salmon, Pacific lamprey, Umpqua chub, and steelhead trout. The North Umpqua watershed, where the Project is located, also provides drinking water to numerous communities.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—21

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

80.     Ground-based logging operations disturb soils, causing erosion, which leads to runoff into streams and the resulting sedimentation of streams and other adverse water quality impacts. Removing trees on steep terrain weakens the roots that reinforce soil and slopes and increases the risk of erosion and landslides. This risk is heightened in recently burned areas.

81.     Logging activities, including commercial salvage logging, remove snags that shade streams, reduce substrate for growing the next generation of trees, increase sediment production from heavy use of unpaved roads and off-road soil disturbance by heavy equipment, and reduce the availability of dead wood to streams and upland portions of riparian reserves. Leaving fire-damaged trees standing helps to slow runoff, reduce sedimentation, and contributes to soil nutrient replenishment.

82.     The Forest Service did not disclose or adequately analyze the potential impacts of Project activities on at-risk aquatic species, nor on the quality of drinking water the Project area provides to several communities.

83.     The Project includes a significant area within Riparian Reserves, which must be managed under special standards and guidelines prohibiting or regulating activities in Riparian Reserves that retard or prevent attainment of the ACS objectives.

84.     Pursuant to ACS standards and guidelines, logging is prohibited in Riparian Reserves, subject to narrow exceptions. Salvage logging is permitted only when required to attain ACS objectives. Trees may also be cut if they pose a safety risk, but should be left on on-site when needed to meet ACS objectives.

85.     The Project authorizes commercial logging on hundreds of acres of Riparian Reserves. It applies a buffer zone of 50 to 120 feet in which trees could be cut but not removed (unless they "fall within the road prism or are a risk to culverts"). Outside this "no-yard" buffer,

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—22

but still within the Riparian Reserves, the Project would allow commercial logging, heavy equipment, skid trails, and slash piles.

86.     The riparian buffer zones are likely to be less effective than they would be in unburned areas as much of the groundcover was removed in the fire, making the soil more fragile and erosion-prone.

87.     The removal of trees through commercial logging will have long-term negative consequences within the logging units. Compaction and disturbance from cutting and yarding logs within the Riparian Reserve will cause soil damage. Cutting and removing the trees will destroy important habitat for many riparian species. As downed logs left in place, the trees would provide groundcover and nutrients which aid post-fire soil and vegetation recovery.

88.     The NWFP allows trees to be *cut* within the Riparian Reserves when they pose a hazard. It does not allow their *removal* if it would prevent attainment of ACS objectives. And it does not change the Forest Service's obligation to manage Riparian Reserves to protect riparian-dependent resources.

89.     The Forest Service does not explain how it will meet ACS objectives for snag and coarse woody debris retention in the Riparian Reserves where commercial salvage will occur. It concedes that the Project will have negative short and long-term consequences, but asserts that the area impacted is small relative to the Project area as a whole. The Forest Service again states that many snags created by the fire will remain in the larger Project area, but does not explain how this affects attainment of ACS objectives within the areas to be logged.

90.     The Project area also contains two inventoried roadless areas, a section of the North Umpqua designated as a "Wild and Scenic River," at-risk botanical species, wetlands, a

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—23

municipal watershed, archeological sites, and areas designated as possessing "remarkable geologic, historic, and scientific" value. Logging will occur in all of these areas.

91.    On August 18, 2021 Defendant Sherri Chambers signed the DM authorizing the Archie Creek Project under a CE intended for "road maintenance and repair." The Forest Service did not prepare an EA or EIS and conducted solely internal scoping, developing and authorizing the plan without public involvement. It did not release a draft proposal before authorizing the Project, denying the public any meaningful opportunity to comment.

92.    Umpqua Watersheds and its members, staff, and supporters, who have been actively engaged with Forest activities for many years, were denied the opportunity to express their concerns with the Project. They duly submitted scoping comments on the Bureau of Land Management's nearby Archie Creek post-fire logging project, and would have done so here given an opportunity. They are deeply concerned by the Project's likely environmental impacts.

93.    Instead of meeting its obligations to analyze and disclose the potential environmental impacts of its actions, the Forest Service simply announced that it was aware of the tradeoffs associated with the Project, which it acknowledged would have "some" additional negative impacts to wildlife habitat, and stated that it fully understood the environmental effects of its actions. The agency did not disclose these environmental effects, consider potential alternatives, or involve the public in its decision.

94.    The Forest Service's issuance of the DM constitutes final agency action subject to judicial review pursuant to the APA, 5 U.S.C. § 706(2).

**FIRST CLAIM FOR RELIEF**
**(NEPA and APA Compliance)**

95.    Umpqua Watersheds re-alleges and incorporates all preceding paragraphs herein by reference.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—24

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

**Count 1:**          **Unlawful Use of Inapplicable Categorical Exclusion**

96.     Federal agencies may avoid preparing either an EIS or EA only when the proposed action is "categorically excluded" from NEPA review.

97.     The Forest Service promulgated a series of CEs under NEPA regulations that defined CEs as a "category of actions which do not individually or cumulatively have a significant effect on the human environment." 40 C.F.R. § 1508.4 (2019).

98.     The Forest Service authorized the Project pursuant to 36 C.F.R. § 220.6(d)(4), which applies to "repair and maintenance of roads, trails, and landline boundaries." The regulation includes examples such as "grading a road," "clearing the roadside of brush without the use of herbicides," and "grooming the surface of [a] trail." When promulgating the regulations, the Forest Service explained that this category applies to "routine repair and maintenance actions." 57 Fed. Reg. 43,180, 43,184 (Sept. 18, 1992).

99.     The Forest Service has promulgated a separate CE specifically for post-fire logging activities, but stipulated that such activities cannot exceed 250 acres. 36 C.F.R. § 220.6(e)(13).

100.    The Project authorizes post-fire logging activities across thousands of acres of the Forest. The Forest Service has identified road maintenance and repair as a secondary goal, incidental to the extraction of fire-damaged trees.

101.    36 C.F.R. § 220.6(d)(4) does not apply to a logging project of this scale, involving the removal of tens of thousands of trees which present no imminent danger to people or property. The Project is not a routine action, nor does it fall within the scope of road "repair and maintenance."

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—25

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

102.    The Forest Service's failure to prepare an EIS, or even an EA, before approving the Archie Creek Project violates NEPA and is arbitrary, capricious, an abuse of discretion, not in accordance with, and without observance of procedure required by law. 5 U.S.C. § 706(2).

**Count 2:**        **Arbitrary Conclusion That No Extraordinary Circumstances Are Present**

103.    The Forest Service is further required to prepare an EA or EIS because "extraordinary circumstances" warranting further analysis exist in the Project area. 36 C.F.R. § 220.6(b).

104.    The potential effect of a proposed action on Federally listed threatened or endangered species, critical habitat, or Forest Service sensitive species may create such extraordinary circumstances and make application of a CE inappropriate. 36 C.F.R. § 220.6(b)(1).

105.    The Forest Service admits that the Project is "likely to adversely affect" Northern spotted owl, a federally listed threatened species. The Forest Service also admits that the Project "may impact" other sensitive and federally listed species and their habitat.

106.    Application of a CE is inappropriate if there is a *possibility* that an action *may* have a significant environmental effect. 36 C.F.R. § 220.6(c). If such a possibility exists, an agency must prepare an EA to determine whether the effect will be significant.

107.    Other "resource conditions" that the Forest Service must take into account when evaluating extraordinary circumstances include designated Wild and Scenic Rivers, wetlands, municipal watersheds, archeological sites, and inventoried roadless areas. The Project area contains all of these protected resources, but the Forest Service offered only conclusory statements as to why the potential effects to these special areas are insignificant.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

108.    The Forest Service failed to articulate a rational explanation for its conclusion that no extraordinary circumstances are present.

109.    The Forest Service's failure to prepare an EIS, or even an EA, before approving the Archie Creek Project violates NEPA and is arbitrary, capricious, an abuse of discretion, not in accordance with, and without observance of procedure required by law. 5 U.S.C. § 706(2).

**SECOND CLAIM FOR RELIEF**
**(NFMA and APA Compliance)**

110.    Umpqua Watersheds re-alleges and incorporates all preceding paragraphs herein by reference.

**Count 1:**        **Salvage Logging in LSR**

111.    The Forest Service has a duty to ensure that the Project is consistent with the NWFP standards and guidelines, including those governing salvage logging in LSR.

112.    The NWFP defines "salvage" as "the removal of trees from an area following a stand-replacing event such as those caused by . . . fire . . . ."

113.    Salvage logging is permitted in the LSR only when it will not degrade habitat now or in the future. It is appropriate only when canopy cover has been reduced to less than 40 percent and coarse woody debris standards can be met. All live trees, including those injured by fire but likely to survive, should be left standing. Enough snags and downed logs should be retained to provide habitat until the stand begins to produce snags and downed logs again.

114.    When mitigating danger trees for road maintenance the Forest Service must still comply with the NWFP, and should consider topping rather than felling trees.

115.    The Forest Service has authorized commercial salvage logging in the LSR without ensuring that or explaining how the NWFP standards will be met.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

116.    The Forest Service asserts that it need not comply with the NWFP standards because the Project is not for the purpose of salvage, but to abate danger trees as part of road maintenance.

117.    The Project authorizes the removal of trees from thousands of acres following a stand-replacing fire. It falls squarely within the definition of "salvage," much of it in the LSR. The Forest Service's stated purpose has no bearing on whether its actions constitute salvage logging. The Project is not exempt from NWFP standards and guidelines simply because the targeted trees are near a road.

118.    The Forest Service did not consider topping trees rather than cutting and removing them. It did not explain why salvage logging was necessary to mitigate danger trees.

119.    The Forest Service has failed to make a rational determination that the Project's logging operations, including commercial salvage in the LSR, are consistent with the NWFP.

120.    The Forest Service's failure to explain how the Project is consistent with the NWFP's LSR standards violates NFMA, and is arbitrary, capricious, an abuse of discretion, not in accordance with, and without observance of procedure required by law. 5 U.S.C. § 706(2).

**<u>Count 2</u>:**    **Salvage Logging in Riparian Reserves**

121.    The Forest Service has a duty to ensure that the Project is consistent with the NWFP, including the ACS.

122.    The ACS generally prohibits logging in Riparian Reserves. The Forest Service authorized commercial salvage logging in protected Riparian Reserves under a provision which allows the felling of danger trees.

123.    *Felling* danger trees does not require *removing* the felled trees, which provide important habitat for riparian-dependent species. The Forest Service has not explained why an

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—28

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

exception for mitigating danger trees allows it to authorize commercial salvage logging on hundreds of acres of Riparian Reserves.

124.    The exception identified by the Forest Service does not excuse it from complying with ACS standards and guidelines.

125.    The Forest Service acknowledged that the Project activities would have a negative impact on riparian habitat in the Reserves. It has failed to make a rational determination that the Project's logging operations, including commercial salvage logging, in Riparian Reserves is consistent with the ACS.

126.    The Forest Service's failure to explain how the Archie Creek Project is consistent with the ACS violates NFMA, and is arbitrary, capricious, an abuse of discretion, not in accordance with, and without observance of procedure required by law. 5 U.S.C. § 706(2).

## PRAYERS FOR RELIEF

 WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in favor of Umpqua Watersheds, Cascadia Wildlands, and Oregon Wild and issue the following relief:

A.    Declare the Forest Service has violated the National Environmental Policy Act and its implementing regulations by failing to prepare either an Environmental Assessment or an Environmental Impact Statement;

B.    Declare the Forest Service has violated the National Forest Management Act and its implementing regulations by authorizing a project that is inconsistent with the Northwest Forest Plan and the Umpqua National Forest Plan;

C.    Declare the Forest Service's issuance of the Decision Memo is arbitrary, capricious, an abuse of discretion, not in accordance with, and/or without observance of procedure required by law under the Administrative Procedures Act, 5 U.S.C. § 706(2)(A), (D);

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

D.      Vacate the Decision Memo and remand to the Forest Service for additional consideration;

E.      Issue preliminary and permanent injunctive relief prohibiting the Forest Service from authorizing implementation of the Archie Creek Project until such time as the Forest Service can demonstrate compliance with the requirements of the National Environmental Policy Act, the National Forest Management Act, and the Administrative Procedure Act;

F.      Award Umpqua Watersheds its reasonable fees, costs, expenses and disbursements, including reasonable attorneys' fees associated with this litigation pursuant to the Equal Access to Justice Act or other applicable statutes; and

G.      Grant such additional relief as the Court deems just and proper.


DATED this 14th day of OCTOBER, 2021.


Respectfully submitted,

s/ Erin E. Hogan-Freemole
Erin E. Hogan-Freemole, OSB # 212850
(541) 301-4618 │ erin@crag.org
Oliver J. H. Stiefel, OSB # 135436
(503) 227-2212 │ oliver@crag.org
CRAG LAW CENTER
3141 E. Burnside St.
Portland, Oregon 97214
Fax: (503) 296-5454

*Attorneys for Plaintiffs*

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—30